Todd Luther NIXON, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 97–357

Supreme Court of Wyoming.

April 10, 2000.

Representing Appellant: Sylvia L. Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Karl Linde, Assistant Public Defender.

Representing Appellee: William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; and D. Michael Pauling, Senior Assistant Attorney General.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and TAYLOR,* JJ.

THOMAS, Justice.

The major complaint presented by Todd Luther Nixon (Nixon) is that the trial court committed an abuse of discretion in denying his motion to withdraw his pleas of guilty to charges of first degree murder and aggravated assault and battery, which was made prior to sentencing. At the change of pleas hearing, in response to a question by Nixon about whether something less than a life sentence could be imposed for murder in the first degree, the trial judge stated: "Under the existing case law a judge could still put you on probation[.]" Nixon claims that he relied upon this comment by the trial judge in changing his pleas from "not guilty" to "guilty." A second issue is raised with respect to the propriety of ordering restitution by a person sentenced to life imprisonment. Our examination of the record persuades this Court that Nixon's change of pleas was motivated by the advantage provided by his plea bargain with the State, and it cannot be perceived as reasonably based upon the erroneous statement by the trial judge. The order of restitution was properly imposed in the absence of any objection by Nixon. The Judgment Upon Pleas of Guilty is affirmed.

In the Brief of Appellant, the issues that are raised are:

ISSUE I

Appellant should have been permitted to withdraw his guilty pleas after the trial court advised him that he could receive probation for first degree murder.

ISSUE II

The trial court's order for restitution was improper because it was based on the mistaken belief that appellant would be work-

---

* Retired November 2, 1998.

ing again in fifteen to twenty years after he had been sentenced to life in prison.

This Statement of the Issues is found in the Brief of Appellee:

I. Did the district court properly deny appellant's motion to withdraw his guilty plea?

II. Was the district court's restitution order proper?

In the Reply Brief of the Appellant, this additional Statement of the Issue is found:

Whether the record supports a finding that appellant knew probation was not a possibility if he pled guilty?

In early June of 1997, Nixon was charged with first degree murder in violation of Wyo. Stat. Ann. § 6–2–101(a) (Lexis 1999) and with aggravated assault and battery in violation of Wyo. Stat. Ann. § 6–2–502(a)(i) (Lexis 1999). Nixon was charged with causing the death of his three-year-old step-daughter, and he was bound over for trial in the district court. He was arraigned on these charges on July 3, 1997, and he entered pleas of not guilty.

In the course of the following month, Nixon entered into a Statement of Agreement pursuant to which the State agreed not to seek the death penalty in exchange for pleas of guilty by Nixon to both counts. In pertinent part, the Statement of Agreement provided:

B. The offense of First Degree Murder is punishable by death or life imprisonment according to law;

C. In consideration of the mutual terms, covenants and conditions of this Statement of Agreement, the respective parties agree with one another, and hereby represent, submit and recommend to the Court as follows:

* * *

3. Conditioned upon, and only after, the Court has accepted the Defendant's said pleas of guilty to Count I and Count II of the Felony Information and has entered said pleas of record, the state will then represent to the Court that it will not endorse the death penalty and will not seek punishment of death upon Count I;

4. Because the entitled case is based upon this Agreement, the Defendant will not file any post guilty plea/conviction motions, requests for sentence reduction, appeals, or post conviction relief petitions, and should the Defendant subsequently file any of the same, the State will be permitted to seek death penalty punishment upon sentencing hearing/resentencing hearing.

* * *

7. This agreement will be disclosed to the Court pursuant to Rule 11 of the Wyoming Rules of Criminal Procedure.

At a change of pleas hearing, held on August 22, 1997, Nixon changed his pleas to guilty. Nixon and the trial judge discussed, at some length, Nixon's understanding of his pleas of guilty and their significance. The trial judge explained that it was possible for the State to elect to seek the death penalty, but it would not necessarily do so. The trial judge also clarified the procedure and safeguards in place if the State should elect to seek the death penalty. The trial judge continued the dialogue with this colloquy:

I want to make sure you understand a couple things. First of all, we'll take as much time as it takes to go through this today. So whenever you want to talk to your attorneys, you just let me know and we'll take a break and you can do that, number one.

Number two, I want to make sure that you understand that I don't intend by any of the things that I may say to you or any things that I may do influence your decision one way or the other.

The decision about what you do here is your decision to make, and my role is not to try to influence you to do something or not do something. That's entirely up to you based upon visiting with your attorneys.

After that, the trial court again sought clarification of Nixon's understanding of the proceedings and their significance. Nixon advised the trial court that he planned to plead guilty to both counts in exchange for the State's relinquishment of its option to seek the death penalty. After all the ramifi-

cations of the pleas of guilty had been thoroughly explained, Nixon changed his pleas on both counts to guilty. The trial judge then offered further explanation of the legal consequences of the pleas of guilty and the rights that Nixon would forgo by entering such pleas.

Nixon asked only one question during the exchange that pertained to sentencing, which led to the major issue in this appeal. The exchange, as it was reported in the record, was:

> THE COURT: That once your plea is accepted, then the only thing left to be decided is what sentence will be imposed, and that sentence worst case could be life imprisonment, plus ten years, plus the fines and other things that I've told you about. Do you have any questions about that?
>
> THE DEFENDANT: Does that sentence have to be life, or can it be something lesser than that?
>
> THE COURT: The sentence is life, however -
>
> THE DEFENDANT: Regardless of -
>
> THE COURT: Excuse me. Let me finish. *Under the existing case law a judge could still put you on probation, but let me tell you that would be extremely unlikely.*
>
> THE DEFENDANT: Okay.
>
> THE COURT: So realistically you need to understand—and it would be my obligation to consider whether or not a life sentence should be suspended and you should be placed on probation, but I'm telling you that it is highly unlikely that would happen in a first degree murder case. Not just because it's you; simply because first degree murder is so serious that someone is probably not realistically looking at probation for it. Do you understand that?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: So you're probably looking at at least a life sentence. So you understand?
>
> THE DEFENDANT: Yeah.

(Emphasis added.)

At that point in the proceedings, Nixon announced that he was not going to plead guilty, and the trial court ordered a short recess. When the trial court reconvened the proceedings, Nixon vacillated and said he was "not going to rule the plea agreement out." The trial judge, Nixon, and Nixon's attorney discussed the guilty pleas some more, and Nixon admitted that he understood he would likely lose if the case were to go to trial. His attorney explained to the trial court, in Nixon's presence, that Nixon did not have a strong case because he had no alibi or explanation for the injuries sustained by the dead child. When he was asked again to say why he was pleading guilty, Nixon responded: "Because the threat of [the] death penalty and * * * trying to spare my family the pain it would cause them if I was put to death." The trial judge reiterated the importance of listening to advice from his attorneys in making his decision, but Nixon continued to vacillate, and the trial judge ordered a second recess so that Nixon could speak with his family and his attorneys once again. Following that recess, Nixon maintained his pleas of guilty to both counts.

For purposes of establishing a factual basis for the pleas, an investigator for the Campbell County sheriff's department testified on behalf of the State. No other witnesses were called by the State, but a number of exhibits were entered before the State rested its presentation. After hearing this testimony and receiving the exhibits, the trial judge inquired of Nixon if he had changed his mind or wanted to plead guilty. Nixon again affirmed his desire to enter pleas of guilty. After the change of plea and the presentation of the Statement of Agreement, a Judgment Upon Pleas of Guilty was entered by the trial court.

Later, on October 2, 1997, Nixon's counsel filed a motion to continue the sentencing hearing because counsel did not receive the Presentence Investigation Report ten days prior to the scheduled date for sentencing as required by W.R.Cr.P. 32(a)(3)(A). In addition, Nixon had advised his attorneys that he was planning to file a motion to withdraw his

pleas of guilty prior to sentencing. Nixon did move to withdraw his pleas of guilty, asserting in his motion that the trial court had furnished improper and misleading advice with respect to the mandatory minimum sentence contrary to the requirements of W.R.Cr.P. 11(b)(1).

The first matter raised at the October 10, 1997 sentencing hearing was the discussion concerning probation between Nixon and the trial judge. Although Nixon conceded that he recognized that the possibility of probation was slim, he contended that it influenced his decision to plead guilty. In the course of the hearing, the State referred Nixon to the Felony Information in which it was stated that first degree murder could be punished by death or life imprisonment, and reminded him that he had conferred with his attorneys about the charges. Nixon had been advised during his initial appearance that first degree murder was punishable by either death or life imprisonment. His attorneys had informed him that the offense was punishable by death or life imprisonment. In the course of the change of pleas hearing, Nixon was advised at least five different times that the penalty for first degree murder was life imprisonment or capital punishment. Finally, the prosecutor pointed out that when the trial judge stated that Nixon was probably looking at least at a life sentence, Nixon had stated he understood.

The prosecution questioned Nixon about the specific advice upon which he based his desire to change his pleas, and Nixon acknowledged that his attorneys never told him that the trial judge made a mistake by stating that probation was a possibility. Nixon also conceded that when asked why he was pleading guilty, he had replied it was because he was afraid of a death sentence and the pain it would cause his family, never mentioning that he believed there was a slim chance of probation. The trial judge conceded that his advice was erroneous, but found the error to be harmless:

> First of all, let me confess that I made an error when I advised Mr. Nixon that there was a possibility, slim as it might be, that he could get probation. * * * So I did incorrectly advise Mr. Nixon that there

was a possibility of probation. I have to say, however, considering the totality of the record today that I conclude that it was harmless error beyond a reasonable doubt, probably beyond any doubt.

The trial judge then denied Nixon's request to withdraw his pleas of guilty.

The trial judge proceeded with sentencing and the imposition of fees and restitution. Nixon was sentenced to a term of life for first degree murder, which was to run concurrent to a sentence of seven to ten years for aggravated assault and battery. In addition, he was required to pay fees for his attorneys of $9,480.00; $2,000.00 to the Crime Victim's Compensation Fund; and restitution in the following amounts:

| | |
|---|---|
| Children's Hospital of Denver | $11,270.62 |
| Donor Alliance | $ 9,750.87 |
| Campbell County Memorial Hospital | $ 1,249.27 |
| Intercare Insurance | $ 5,961.48 |
| Wilson Noecker Funeral Home | $ 2,129.00 |

The trial judge found Nixon had the ability to pay the restitution or a reasonable probability existed that Nixon would have such ability to pay in the future.

In his appeal, Nixon asserts as error the denial of his motion to withdraw his pleas of guilty and the requirement for restitution pursuant to the trial court's sentence. He asserts that the denial of his motion to withdraw his pleas of guilty constituted an abuse of discretion, and that the trial court was mistaken in ordering restitution because it was premised on a mistaken belief that Nixon would have the ability to pay while serving a life sentence.

■ A defendant does not enjoy an absolute right to withdraw a plea of guilty prior to the imposition of sentence. *Osborn v. State,* 672 P.2d 777, 788 (Wyo.1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984); *Ecker v. State,* 545 P.2d 641, 642 (Wyo.1976). The trial court is vested with discretion to determine whether to grant a motion to withdraw a plea of guilty made prior to sentencing, and it does not abuse that discretion by denying the withdrawal of the plea so long as the requirements of W.R.Cr.P. 11 were complied with at the time the plea was accepted. *Kaldwell v. State,* 908 P.2d 987, 990 (Wyo.1995). Even when the defendant provides a plausible or

just and fair reason for withdrawal of the plea of guilty, the denial of the defendant's motion does not amount to an abuse of discretion if the trial court conducted a careful hearing pursuant to W.R.Cr.P. 11 at which the defendant entered a plea or pleas of guilty that was knowing, voluntary, and intelligent. *Osborn*, 672 P.2d at 778–79. A decision of the trial court to deny a motion to withdraw a plea of guilty will not be reversed for an abuse of discretion so long as the district court reasonably could conclude as it did. *Johnson v. State*, 922 P.2d 1384, 1386 (Wyo.1996). More recently, in *Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998), this Court elected to follow the definition of abuse of discretion adopted in *Martin v. State*, 720 P.2d 894, 897 (Wyo.1986), which is:

> "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Byerly v. Madsen*, 41 Wash.App. 495, 704 P.2d 1236 (1985)."

Nixon challenges the voluntariness of his pleas of guilty. He contends the trial court did not comply with W.R.Cr.P. 11 because he was not properly informed of the mandatory minimum sentence for first degree murder at the change of pleas hearing. He asserts that the improper advisement furnishes a "just and fair" reason for permitting withdrawal of his pleas of guilty and the denial of his motion by the trial court amounted to an abuse of discretion. In *Mehring v. State*, 860 P.2d 1101, 1109 (Wyo.1993) (*quoting Shelton v. United States*, 246 F.2d 571, 572 n. 2 (5th Cir.1957), *rev'd on other grounds*, 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958)), this Court adopted the test for voluntariness of a plea articulated in *Brady v. United States*, 397 U.S. 742, 755, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747 (1970):

> " '[A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (in-

cluding unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).' * * * "

Nixon's premise is that the erroneous advice concerning the mandatory minimum sentence violated W.R.Cr.P. 11. He argues that his pleas were involuntary and he was deprived of his due process right because of the erroneous advice. Specifically, W.R.Cr.P. 11(b) provides that before accepting a plea of guilty,

> the court must address the defendant personally in open court and, unless the defendant has been previously advised by the court on the record and in the presence of counsel, inform the defendant of, and determine that the defendant understands, the following:
>
> > (1) The nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law and other sanctions which could attend a conviction * * *.

It is clear from this record that in the course of the change of pleas hearing, the trial court informed Nixon that in exchange for his pleas of guilty to the two counts contained in the Information, the prosecution would not seek the death penalty, and he would face at the most only consecutive life sentences. Nixon then entered pleas of guilty. Subsequently, in a discussion designed to clarify the ramifications of the pleas of guilty, the trial court did allude to the possibility of probation, but it concluded that exchange by stating that Nixon realistically was looking at a life sentence at the very least, and Nixon responded that he understood.

■ We must acknowledge the error in suggesting the possibility of probation, as the trial court did. We are satisfied, however, that the error was harmless beyond any reasonable doubt. In *Stice v. State*, 799 P.2d 1204, 1208 (Wyo.1990), the trial judge committed a similar error by failing to strictly comply with W.R.Cr.P. 15 (now W.R.Cr.P. 11), the trial judge did not inform Stice in open court of the minimum and maximum penalty for his crime. The error was deemed harmless because Stice had been made aware of the minimum and maximum

penalties by statements his own attorney made to him in open court. *Stice*, 799 P.2d at 1208. In that case, we summarized the purposes for strict compliance with W.R.Cr.P. 15:

> Those purposes are to assist the judge in making the constitutionally required determination that a defendant's plea is truly voluntary, to produce a complete record at the time the plea was entered of the factors relevant to this voluntariness determination, and to enable more expeditious disposition of the numerous and often frivolous post-conviction attacks on the constitutional validity of guilty pleas.

*Stice*, 799 P.2d at 1209. We also rely upon the language of W.R.Cr.P. 11(h) to the effect that "[a]ny variance from the procedures required by this rule which does not affect substantial rights shall be disregarded."

The record simply does not support any claim by Nixon that he relied upon the erroneous advice in changing his pleas to guilty. Beginning at his first appearance, and throughout the court proceedings, including the plain language found in the Statement of Agreement, Nixon heard at least five times that the charges involved a minimum penalty of a life sentence. He entered pleas of guilty prior to the reference to probation, and when asked later during the same proceedings and again at the sentencing hearing, Nixon said that he was pleading guilty because he wanted to avoid the death penalty, without mentioning any belief that he would receive probation if he persisted in his pleas of guilty.

The testimony presented at the sentencing hearing is so patently inconsistent with what occurred at the change of pleas hearing that Nixon's credibility is called into question. This supports the conclusion of the trial court that the error in alluding to probation was harmless beyond a reasonable doubt. We have held that a trial court does not abuse its discretion in denying a motion to withdraw a plea of guilty where the credibility of the defendant is an issue. *Bird v. State*, 939 P.2d 735, 737 (Wyo.1997); *Johnson*, 922 P.2d at 1386.

The major thrust of Nixon's argument is that he believed the trial court would place him on probation if he entered pleas of guilty, but yet he moved to withdraw the pleas of guilty before the trial court had any opportunity to consider probation. This tactic makes his position questionable as a rational and logical one. A conundrum is present in such an instance when the advice the defendant claims to have relied upon is not tested by proceeding to sentencing. We recognize that after he is sentenced, a defendant must demonstrate a manifest injustice in order to withdraw a plea of guilty. W.R.Cr.P. 32(d); *State v. McDermott*, 962 P.2d 136, 138 (Wyo.1998). In this instance, however, we do not perceive that Nixon could be accused of waiting to move to withdraw his pleas of guilty simply to test the degree of the potential punishment. Not only do we agree that any error was harmless as a matter of law, but there is good reason to believe that Nixon is simply endeavoring to manipulate the criminal justice system.

We have said that when the record demonstrates that a plea is made in the face of a meritorious defense or continued assertions of innocence, a fair and just reason for withdrawal of the plea of guilty was presented, and the court might have abused its discretion by denying the motion to withdraw prior to sentencing. *Wright v. State*, 703 P.2d 1102, 1104 (Wyo.1985). *See also Schmidt v. State*, 668 P.2d 656, 663 (Wyo.1983) (Rose, J., dissenting) ("the most important mitigating factor in granting a plea-withdrawal motion is that the defendant believed or had reason to believe that a meritorious defense was available to him."). In this instance, at the change of pleas hearing, Nixon's attorney could provide no alternative explanation for the events resulting in the criminal charges, and Nixon claimed to have no memory of the event or any alibi. Obviously, he is unable to point to a meritorious defense or even make a claim of innocence.

■ Furthermore, he had changed his pleas to guilty prior to the misadvice by the trial court. While Nixon vacillated from pleading guilty to pleading not guilty during the course of the hearing, at the time the erroneous advice was given the pleas before the trial court were "guilty." Later, Nixon went from his pleas of guilty to pleas of not guilty, and, after further consultation, he went back to his pleas of guilty. Since he was willing to plead guilty prior to the erroneous advice, it is difficult to identify any prejudice to Nixon attaching to the misadvice

as a motivation for his ultimate pleas of guilty. When misinformation or a misinterpretation of the law occurs after the defendant has been properly advised about the charge and the punishment available, the plea is entered voluntarily. As we said in *Peper v. State*, 768 P.2d 26, 30 (Wyo.1989):

> [H]e must show that fairness and justice require the withdrawal of his guilty plea, as would be the case where the record demonstrates that the plea was made in the face of a meritorious defense or continued assertions of innocence. *Wright v. State*, 703 P.2d 1102, 1104 (Wyo.1985). Such is not the case here where appellant premises his alleged innocence, and/or his alleged defense, solely on an erroneous interpretation of the statute under which he was charged. Furthermore, this misinterpretation was conceived after the court had properly informed him of the charge and had determined that he pled voluntarily. Although the grant or denial of a motion to withdraw a guilty plea is a reviewable exercise of the district court's discretion, there can be no abuse of that discretion where the record shows that the plea was voluntary and made with a full understanding of the consequence, and where the trial court found a factual basis for that plea. *Schmidt v. State*, 668 P.2d 656, 660 (Wyo.1983).

We hold that considering the circumstances of this record, Nixon failed to provide any just and fair reason to permit the withdrawal of his pleas of guilty.

■ We turn then to the claim of error regarding the imposition of restitution. Nixon's contention is that the trial court erred in its conclusion that there was a legitimate basis for finding that he had the ability to pay restitution. Nixon failed to object to the imposition of restitution at his sentencing hearing. The claim of error, therefore, is to be reviewed under a plain error standard. The defendant who asserts plain error must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious way, and that a substantial right has been adversely affected to the end that the defendant was materially prejudiced. *Hodgins v. State*, 962 P.2d 153, 156 (Wyo.1998); *Hampton v. State*, 558 P.2d 504, 507 (Wyo. 1977).

■ Nixon is unable to articulate an unequivocal rule of law that requires the trial court to find that he has the ability to pay. In the absence of such a demonstration, the trial court did not commit any error. Nixon maintains that Wyo. Stat. Ann. §§ 7–9–102 and 7–9–103 (Lexis 1999) and Wyo. Stat. Ann. § 1–40–119 (Michie 1997) require that there be evidence in the record supporting the existence of a present or future ability to pay. This claim is disparate from the correct rule. The sentencing court is under no obligation to determine that there is an ability to pay restitution. *Helmlinger v. State*, 855 P.2d 363, 365 (Wyo.1993); *Murray v. State*, 855 P.2d 350, 359 (Wyo.1993), *cert. denied*, 510 U.S. 1045, 114 S.Ct. 693, 126 L.Ed.2d 660 (1994). The sentencing court is required to order a defendant to pay restitution unless it specifically finds the defendant is unable to pay. *Helmlinger*, 855 P.2d at 365. Even when a sentencing court has a strong suspicion of a reasonable possibility that a defendant such as Nixon cannot pay restitution, that does not rise to the specific finding required pursuant to Wyo. Stat. Ann. § 7–9–102. *Brenning v. State*, 870 P.2d 349, 351 (Wyo.1994). In *Murray*, 855 P.2d at 359, we reconciled Wyo. Stat. Ann. §§ 7–9–102 and 7–9–103, and determined that:

> [T]he court must make a specific finding only when the defendant does not have a present or prospective ability to pay. Although the court is not required to specifically find that a defendant has the ability to pay, the record must still contain evidence to support the existence of a present or future ability to pay.

*See also Helmlinger*, 855 P.2d at 365. In *Helmlinger*, 855 P.2d at 366, we recognized the ability of a defendant to earn income in the penitentiary and to make payments to satisfy the obligation for restitution.

■ As these propositions are applied in Nixon's instance, the trial court inferred that Nixon would have the ability to pay in the future, beginning with his canteen money earned while at the penitentiary. While the opportunity to have his life sentence commuted to a term of years, ultimately leading to a release, indeed is limited, there is a possibility in Wyoming for that to occur, and Nixon then would be able to make payments upon

his release. The trial court has only one opportunity to impose the obligation for restitution. The future enforcement of restitution becomes an executory proceeding with respect to which further hearings may occur, and Nixon, if he lacked the ability to pay, could appeal any enforcement at that time. *Seaton v. State*, 811 P.2d 276, 281 (Wyo. 1991).

■ As a part of the sentence, the trial court also ordered Nixon to pay a $2,000.00 surcharge to the crime victim's compensation account. This payment is provided for in Wyo. Stat. Ann. § 1–40–119, which states, in pertinent part:

(c) Under no circumstances shall a court fail to impose the surcharge required by subsections (a) and (b) of this section if the court determines the defendant has an ability to pay or that a reasonable probability exists that the defendant will have an ability to pay.

This statute also imposes a mandatory duty on the trial court to order payment of the surcharge. In *Murray*, this statute was invoked, and we held that in order to assess the victim's compensation surcharge, the trial court was required to find an ability to pay. *Murray*, 855 P.2d at 359. The statutory requirement is satisfied in Nixon's case because he entered pleas of guilty pursuant to the Statement of Agreement, and based on the information in the presentence investigation report, the trial court determined that Nixon had the ability to pay or a reasonable probability existed that he would have the ability to pay in the future.

■ With respect to the required payment for court-appointed counsel, Wyo. Stat. Ann. § 7–6–106(c) (Michie 1997) does not require a sentencing court to make a specific oral or written conclusion that the defendant has the ability to pay. *Collier v. State*, 920 P.2d 265, 267 (Wyo.1996). As is true with respect to restitution, there is no requirement that there be a current ability to pay, a future ability will suffice to impose this obligation. "[T]he record must still contain evidence to support the existence of a present or future ability to pay." *Murray*, 855 P.2d at 359. The trial court's order to pay must be reasonable, and under these circumstances, the consideration of reasonableness includes future ability to pay as well.

The trial court considered a number of facts, including the presentence investigation report, Nixon's statements, and statements by both the defense and the prosecution in reaching its conclusion with respect to whether Nixon had the ability or the future ability to pay restitution. While Nixon was not able to pay $30,000.00 at the time of sentencing, the trial court did find a reasonable probability that he would have the ability to pay in the future. According to the specific language of the statute, the sentencing court is authorized to impose an order of restitution under these circumstances, and there was no error in assessing the restitution provided for in Nixon's sentence.

The sentence of incarceration on both counts and the requirement for restitution are affirmed.